THE SCOW No. 19.[1]

EASTON & AMBOY Co. *v.* THE SCOW No. **19.**

(*District Court, S. D. New York.* May 18, 1891.)

SALVAGE—DERELICT SCOW—EAST RIVER—DAMAGE TO THIRD BOAT.

About 2 o'clock in the morning of March 25, 1891, those on libelant's tug-boat Mercedes perceived a capsized mud-scow adrift in the East river. With great difficulty, owing to the unwieldy nature of the scow, the tug pushed and guided the scow to the end of pier 10, breaking a hawser in the attempt. The tug then went for aid, and while she was gone the scow broke adrift from the pier, and damaged a schooner. It was afterwards picked up by three tugs belonging to the same owner as the Mercedes, and taken to Jersey City. The value of the scow was $3,200 to $4,000. *Held,* that the owner of the tugs should recover $600 as salvage, from which should be deducted the amount paid by claimant for the damage to the schooner.

In Admiralty. Suit to recover salvage.

*R. D. Benedict,* for claimant.

*Goodrich, Deady & Goodrich,* for libelant.

BROWN, J. About 2 o'clock on the morning of March 25, 1891, as the libelant's boat Mercedes was proceeding down the East river, the capsized mud-scow No. 19 was observed in the East river, drifting towards the drilling machine at Diamond Reef. The pilot of the tug undertook to rescue the scow, but found much difficulty in getting a suitable hold upon it, as the scow was large, heavy, and unwieldy. After pushing it away from Diamond Reef, he at length got a hawser attached to it, but in attempting to tow the scow to Jersey City the hawser broke, and, the flood tide setting in, and finding himself unable to secure another line to the scow, he succeeded in pushing and guiding it to the outer end of pier 10, East river, where it was temporarily made fast to spiles at about 5 A. M., with the intent to take it afterwards to some other more proper place of mooring. The tug then left to change her crew at 6 A. M., and to give notice to the tug-owners of the need of other tugs. The tug Atalanta accordingly was sent a few hours afterwards to move the scow, but, her pilot finding it too cumbersome, at about 9 A. M. went for additional help, and the tugs Sayre and Kalbfleish, belonging to the same owners, were procured. Before they arrived at pier 10, however, the scow, between 11 and 12 o'clock, A. M., had parted her upper line, either through the action of the ebb-tide or from the effects of the swells of passing steamers, which are not shown, however, to have been more than usual there; so that in swinging around with the ebb-tide to the southward she damaged the sloop Vail, moored near her, in the sum of $267.93, which the owners of the scow shortly after paid. The scow floated down near Governor's island, where she was picked up by the three tugs above named; but, as they found it difficult to cross the North river tide, they took her to pier 3, North river, which was reached at about 7 P. M. of

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

the same day. The next morning the scow was towed to the Morris canal basin at Jersey City, and afterwards to Gowanus, and the above libel thereupon filed for salvage compensation.

The most important elements in the case are: **(1)** That the scow was apparently derelict, floating down the harbor in the night-time, and liable to do serious damage, not only to herself, but specially to any other vessels that she might encounter; (2) the great difficulty in handling her. If the service was without any serious danger to the tugs, it was at least laborious, and four tugs, to the value of $60,000, were engaged in the service. The mooring of the vessel at pier 10 was evidently not considered by the salvors as the close of their services. The scow was pushed in there because it seemed to be the best place in the immediate vicinity for temporary mooring. I think the evidence shows that the end of pier 10, a narrow wharf, with spiles for making fast but 22 feet apart, was not a suitable place to moor such a scow, 118 feet long, for any considerable time. Evidently that was not designed. It was a question of judgment, however, for the pilot of the tug, after he had broken his hawser, and could only handle or guide the scow by pushing her, where it was best for him to go. Considering these difficulties, that it was night-time, and that additional dangers might be encountered by attempting to cross to Brooklyn or to go up to the Wallabout, I cannot hold him answerable for negligence in pushing in while he could at pier 10, and tying up there till proper help could be obtained. Instead, however, of procuring speedily the assistance of other tugs, which were near at hand, he elected to wait for the coming of other tugs of the same line, thereby delaying the removal of the scow over six hours. In choosing this course, probably for the purpose of retaining to that one line the whole compensation, I think the salvors took on themselves the risk of their delay in leaving the scow unnecessarily during the ebb-tide at a pier that was evidently of doubtful fitness, and with fastenings that proved insufficient. The salvors were liable, therefore, for the damages to the Vail; and the payment made by the owners of the scow in satisfaction of the Vail's just demand should be credited to the owners in an equitable action like that for salvage.

The value of the scow was from $3,200 to $4,000; that of the Mercedes $18,000. One or two other tugs would have been necessary to remove the scow speedily and safely in the daytime from pier 10 to a proper place of deposit, if she had not broken loose; and such as would naturally have been employed would have been probably worth from $25,000 to $36,000 more. The value of the tugs actually employed was about $60,000.

I do not think the merits of the salvors are diminished by the fact that they did not happen to be experts in dealing with so unusual a subject of salvage as a capsized scow, and did not, therefore, resort to the expert device of cutting holes through the bottom near the keelson, for the purpose of securing a firm and easy attachment of the hawser. Considering all the circumstances, and without charging the scow for the extra services required through her breaking loose from pier 10, I think

that $600 would be a fair salvage compensation, to which should be added $21.87 for the loss of the hawser during the first part of the service. This makes $621.87, from which, deducting the sum of $267.93 for damages paid by the claimants, there remains $353.94, for which a decree may be entered, with costs; $100 of the award to be paid to the captain and crew of the Mercedes, 'the rest to the owners of the tugs. See *The Anna*, 6 Ben. 166; *A Raft of Spars*, Abb. Adm. 485; *The Lee*, 24 Fed. Rep. 47; *Raft of Piles*, 42 Fed. Rep. 917.